[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15761

_____

D.C. Docket No. 3:17-cr-00043-RV-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOSHUA DAVID SAMS,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(April 18, 2019)

Before ROSENBAUM, BRANCH and HIGGINBOTHAM,* Circuit Judges.

PER CURIAM:

_____

  * Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by designation.

Joshua David Sams appeals from his seven fraud-related convictions.  He argues that the government's evidence of his guilt was insufficient.  After careful consideration, we affirm.

**I.**

The district court recounted that the jury could have found the following facts based on the evidence presented at Sams's trial:

> In 2011, Christopher Asmar came up with the idea for a social media cell phone "app" known as HippySocial. While looking for a software engineering firm capable of developing the app for him, Asmar was introduced to the defendant.  The defendant, who had experience with computers (but was not employed as a software engineer or developer), represented that he could help Asmar find a qualified engineering firm to develop the app, and he offered his services as a paid "consultant."  The defendant then contacted his friend, an entrepreneur and hot air balloon pilot named Henry Steiger, and had him pose as a software developer named Robert Woods, president of Woods Security Group (WSG).  "Robert Woods" told Asmar that his company had an office in California staffed with 50 software engineers capable of developing the app. These and numerous other lies induced Asmar to enter into contracts and ultimately pay the defendant and WSG about $300,000 to develop the app.  Asmar testified during trial that if he had known the truth, he never would have signed the contracts.

In a footnote, the court noted that Sams had "conceded that Steiger, who has a medical background, 'knows about as much about the actual technology [of software

2

development] as I know about medicine.'"  The court continued its recitation of the evidence at trial:

> This case is a little unusual in that despite all of the lies and misrepresentations, it appears that the defendant wanted and expected the app to succeed; and with help from some (mostly Russian) contract engineers that he hired, he eventually completed it and delivered it to Asmar pursuant to the contract.

The evidence at trial revealed that, while Asmar paid Sams about $332,000, Sams paid the contract engineers about $78,000 to produce the app.  The district court continued its recitation:

> Although Asmar was never given access to the full code— and it would not always work properly as it would sometimes turn off and on—he was very pleased with the app overall.  Nevertheless, for a variety of different reasons, HippySocial did not turn out to be "the next Facebook" success that the parties had anticipated.
>
> In an attempt to get additional payments out of Asmar, the defendant then had another friend, Michael Karl Turner, pose as a man named Brett Prince and claim that he represented LVMH Acquisitions Inc., a (fictitious) company that wanted to buy the completed HippySocial app for $6 million.  To further the scheme, "Brett Prince" gave Asmar an investment account statement reflecting that LVMH's account had a balance of $14 million, which was a total fabrication.

For Sams's conduct related to Asmar's payments for developing the app, a grand jury charged Sams with one count of conspiracy to commit wire fraud, 18 U.S.C. §§ 1343, 1349 (Count I), three counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts II-IV) and one count of money laundering, in violation of 18 U.S.C.

3

§ 1957 (Count V).  For the conduct related to the purported offer to purchase the app, the grand jury charged Sams with another count of conspiracy to commit wire fraud (Count VI) and one count of wire fraud (Count VII).  The same indictment charged codefendants Steiger and Turner with counts of wire fraud and conspiracy to commit wire fraud.  Both codefendants pled guilty and testified at Sams's trial.

## II.

On appeal, Sams argues that the government's proof of all of the charged crimes was insufficient.  Specifically, as to the wire-fraud counts related to the development of the app, charged in Counts II, III, and IV of the indictment, Sams asserts that the government's proof that he participated in a scheme to defraud was insufficient because Asmar "received what he bargained for."  And in the absence of the substantive wire-fraud counts, he says, the government's proof of Counts I and V, which charged conspiracy and money laundering related to Counts II through IV, was also insufficient.  As to the wire-fraud count charged in Count VII of the indictment, Sams says that the conduct at issue was a lawful attempt to collect a legitimate debt Asmar owed him related to the development of the app.  In the absence of that wire-fraud count, Sams further contends, the evidence of the conspiracy charged in Count VI was also insufficient.

A defendant is guilty of wire fraud if the evidence proves that the defendant (1) intentionally participated in a scheme or artifice to defraud another of money or

4

property, and (2) the defendant used interstate wires, or caused them to be used, for the purposes of executing the scheme.  18 U.S.C. § 1343; *United States v. Bradley*, 644 F.3d 1213, 1238 (11th Cir. 2011).  Here, only the first element is at issue.

The words "to defraud" commonly refer "to wronging one in his property rights by dishonest methods or schemes" and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching."  *McNally v. United States*, 483 U.S. 350, 358 (1987); *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924); *United States v. Svete*, 556 F.3d 1157, 1161-62 (11th Cir. 2009) (*en banc*).  To prove the "scheme or artifice to defraud" element of wire fraud thus "requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property."  *Bradley*, 644 F.3d at 1238; *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009).

We revisited the definition of "scheme to defraud" in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016).  The defendants in that case did not dispute that they lured customers into their bar using women whom they secretly compensated to pose as patrons of their establishment. *Takhalov*, 827 F.3d at 1310-11.  But the government also presented evidence that the defendants' employees engaged in other fraud to increase the victims' tabs, which the defendants claimed to have known nothing about.  *Id.*  The defendants therefore proposed that the court instruct the jury that, if they believed the defendants knew nothing other than that

5

they were paying the women to lure in customers, and found that the customers requested the drinks and received them at the stated prices, then the jury must acquit. *Id.* The trial judge did not give the requested instruction, and the jury convicted the defendants. *Id.* at 1311.

We reversed. *Id.* at 1316. Recounting our prior precedent, we noted that "if a defendant does not intend to harm the victim—'to obtain, by deceptive means, something to which [the defendant] is not entitled'—then he has not intended to defraud the victim." *Id.* at 1313 (quoting *Bradley*, 644 F.3d at 1240). Thus, we extrapolated, if the jury concluded that the defendants "gave the victims exactly what they asked for and charged them exactly what they agreed to pay," then there had not been a scheme to defraud. *Id.* at 1310, 1314. To illustrate the point, we gave the following hypothetical:

> [A] young woman asks a rich businessman to buy her a drink at Bob's Bar. The businessman buys the drink, and afterwards the young woman decides to leave. Did the man get what he bargained for? Yes. He received his drink, and he had the opportunity to buy a young woman a drink. Does it change things if the woman is Bob's sister and he paid her to recruit customers? No; regardless of Bob's relationship with the woman, the businessman got exactly what he bargained for. If, on the other hand, Bob promised to pour the man a glass of Pappy Van Winkle [an expensive bourbon] but gave him a slug of Old Crow [a cheap bourbon] instead, well, that would be fraud. Why? Because the misrepresentation goes to the value of the bargain.

*Id.* at 1313.

Our decision in *Takhalov*—which concluded that no scheme to defraud occurred where a defendant provided purported victims with "exactly what they asked for and charged them exactly what they agreed to pay"—expresses the same rule we have applied in our prior precedent.  In *Maxwell*, for example, the defendant was the executive in charge of an office of a large contracting company.  579 F.3d at 1288.  The defendant won several contracts to do electrical work for the government by representing that small or disadvantaged businesses, or both, were performing a "commercially useful function in the completion of the contract[s]" when, in fact, those businesses were merely passing payments along to the defendant's company, which was performing all of the work.  *Id.* at 1288-89.  The defendant's company ultimately performed on the contracts, but we held that its deception nevertheless constituted a "scheme to defraud" because the defendant "dishonestly circumvent[ed] the worthy purpose" of the government's requirements. *Id.* at 1303.

Our decisions in *Takhalov* and *Maxwell* are also consistent with other circuits' interpretations of "scheme to defraud."  In *United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010), for example, the Ninth Circuit likewise concluded that the intent to harm that a scheme to defraud requires is satisfied when a defendant deceives victims into paying for items or opportunities of one type while actually providing another type, which differs in some way important to the victims, from what was promised:

> The intent to induce one's victim to give up his or her property on the basis of an intentional misrepresentation causes "harm" by depriving the victim of the opportunity to weigh the true benefits and risks of the transaction, regardless of whether or not the victim will suffer the permanent loss of money or property.

*Treadwell*, 593 F.3d at 997-98. As we noted in *Maxwell*, "financial loss is not at the core" of mail and wire fraud, and such a scheme can exist "[r]egardless of the quality or cost of the work completed" by the schemer. *Maxwell*, 579 F.3d at 1302.

In reviewing whether the government's evidence was sufficient to prove that Sams's conduct constituted a scheme to defraud, we view the evidence in the light most favorable to the government and draw all reasonable inferences and credibility choices in favor of the factfinder's verdict. *United States v. Suarez*, 893 F.3d 1330, 1333-34 (11th Cir. 2018).[1]

Applying those principles to this case, Sams's conduct constituted a scheme to defraud. First, contrary to Sams's argument that the evidence of Counts I through V of the indictment was insufficient, Sams did not provide Asmar with "exactly what he paid for."

Sams represented to Asmar that his friend Steiger was "Robert Woods," president of Woods Security Group, which had 50 software engineers ready to

---

[1] We reject Sams's suggestion, raised for the first time in his reply brief, that we should not view the evidence in the light most favorable to government. Merits of his contention aside, "we decline to consider issues raised for the first time in an appellant's reply brief." *United States v. Britt*, 437 F.3d 1103, 1104 (11th Cir. 2006).

8

develop his app idea.  Using the analogy in *Takhalov*, Sams offered Asmar Pappy Van Winkle.  Naturally, Asmar testified that he would not have signed the contract had he known that "Robert Woods" was actually a hot-air balloon pilot, not the president of a company with a team of software engineers.  Sams ultimately delivered something fairly described as a completed "app," but neither the fictional Woods nor the fictional expert company had been involved.

Rather, Sams pocketed Asmar's money and hired relatively inexpensive contract programmers.  Instead of serving Asmar the promised Pappy Van Winkle, Sams poured Old Crow.  And it showed in the programming.  The government presented evidence that the app shut off from time to time and experienced other "bugs."  Sams deprived Asmar of the opportunity to weigh the true risks and benefits of the transaction and thereby accomplished a scheme to defraud.  *See Treadwell*, 593 F.3d at 997-98.  As we have previously held, this is true regardless of whether Asmar experienced a financial loss, and regardless of the quality or cost of the work performed by Sams's contract engineers.  *Maxwell*, 579 F.3d at 1302.

The government's evidence of the wire fraud charged in Counts II, III, and IV was therefore sufficient to prove Sams's guilt.  And, since Sams makes no other argument about the sufficiency of the related conspiracy and money-laundering counts, the evidence of Counts I and V was also sufficient.

Having concluded that the government's evidence of Counts I through V was sufficient, we also reject Sams's arguments concerning the sufficiency of the government's evidence of Counts VI and VII. Those arguments are premised on Sams's assertions that Asmar owed Sams a legitimate debt for his role in developing the app and that proof of a scheme to defraud had to include Sams's attempt to receive "something to which he was not entitled." But Asmar's purported debt to Sams was the result of Sams's scheme to defraud, and not something to which he was entitled. The government's evidence of Counts VI and VII was therefore sufficient.

## III.

In sum, the judgment of the district court is **AFFIRMED**.