[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-10783
_____

D.C. Docket No. 0:18-cr-60174-BB-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

THOMAS MICHAEL WHITE,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 29, 2021)

Before JORDAN, JILL PRYOR and BRANCH, Circuit Judges.

PER CURIAM:

A jury convicted Thomas Michael White of one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349, and four counts of mail fraud, in violation of 18 U.S.C. § 1341. The district court imposed a sentence of 168 months' imprisonment. White appeals his convictions and his resulting sentence. After careful review, and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

This appeal arises out of an eight-day jury trial. In the interest of efficiency, we recount only the facts necessary for the resolution of this appeal. On June 21, 2018, the grand jury returned a five-count indictment against White and two codefendants, John Reech and Joseph Genzone, charging them with conspiracy to commit mail and wire fraud from approximately December 2011 to November 2014 (Count 1) and mail fraud (Counts 2 through 5, with dates ranging from June 25, 2013 to October 6, 2014).[1] The charges stemmed from the defendants' involvement in a company called First Call Ventures, LLC ("FCV"), which brokered residential moving services. White was co-founder, President, and Chief Executive Officer of FCV; Reech and Genzone worked at FCV. White, together with Reech and Genzone, solicited investors to fund operations at FCV. The indictment charged that White and his codefendants conspired to—and did— "misappropriate[e] [FCV] investor money for their personal use and benefit by

---

[1] Count 6, wire fraud in violation of 18 U.S.C. § 1343, was dismissed.

2

making material false and fraudulent representations, and concealing and failing to state material facts concerning, among other things, the profitability and safety of investing" in FCV. Doc. 3 at 3–4.[2]

**A. Trial**

White proceeded to a jury trial. Reech and Genzone pled guilty to Count 1 only; Reech testified against White. The government also offered testimony from a cooperating witness, Steven Goldstein, and four FCV investors, Gary Treat, Michael Niles, Mary Jane Adams, and Linda Elliot. Additionally, a financial investigator, Jonathan Jackson, and an FBI agent, Justin Brannon, testified for the government and prepared summary exhibits showing all the investments victims made in FCV.

The following evidence was admitted at trial. FCV operated a call center where employees booked moves on behalf of residential moving companies and generated brokerage fees. The company also sought and obtained investors in the business. White and his colleagues at FCV induced 15 investors to loan $1,936,400 to FCV via convertible notes by misrepresenting FCV's profitability and the way in which investor funds would be used.

White, as co-founder, President, and CEO of FCV, was the "head person" who led the "whole operation." Doc. 132 at 61. He was joined by two "partners":

---

[2] "Doc." numbers are the district court's docket entries.

cofounder and Chief Financial Officer Howard Markowitz and call center manager Simon Itah.  Doc. 143 at 80.

FCV sold investors "convertible notes"—loans to FCV, essentially—that supposedly would provide investors with high monthly interest payments and the opportunity either to convert the debt into equity in FCV or to recoup the investor's principal in a year's time.  Doc. 143 at 83.  The company preferred that investors take the equity option because it relieved FCV of its steep interest payment obligations.

Both the initial investment and the loan conversion processes were part of the fraudulent scheme.  Reech, Genzone, an employee named Elizabeth Kipness, and others acted as "fronters," cold-calling potential investors.  Reech and his fellow fronters pitched the investment opportunity to potential investors using a script that White created.  The script told investors that FCV was very profitable and a huge success and that investment in FCV was a safe option.  Eventually, Reech would turn interested potential investors over to White.  White, as the closer of the investment deals, told the same story as his fronters about the success and profitability of FCV and the safety of investing in the company.  White also told investors that money to pay interest on their convertible notes would come from the business's success.

4

According to Reech, none of that was true.  By the time Reech began attempting to convert current investors' debt to equity, the company was failing.  Neither he nor White disclosed FCV's financial peril to the company's investors.  White and his colleagues continued soliciting money from current and potential investors based on the same representations that the company was profitable and a great success.  White flew current investors in to visit FCV in an effort "to get more money from them."  *Id.* at 127–28.  Reech and White knew investors were using retirement funds to invest in FCV.

In late July 2013, after being assured all along that FCV's business was booming, investors received notice that FCV was in a "crisis situation."  Doc. 170-7.  FCV sent its investors a letter stating that "due to some recent negative publicity and other unforeseen circumstances," business had "dropped off precipitously."  *Id.*  FCV "stop[ped] all payments on investor notes," including interest, and gave investors an ultimatum of sorts:  extend the maturity dates of their notes for six months or risk losing everything if FCV went under.  *Id.*  Investors called White with questions, but he was evasive.  One victim, Mary Jane Adams, requested return of her principal and was denied.  From September 2013 onward, no victim received any additional interest payments or recovered any principal.

5

Four victims to whom White and others made misrepresentations testified at trial. Gary Treat, a small business owner, loaned FCV $139,430.61 of his retirement money. Count 1 was based on a mailing FCV sent to Treat. Adams, a retiree in failing health, withdrew funds from her retirement annuity and, after paying a withdrawal penalty, invested $60,000 in FCV. Count 2 was based on a mailing FCV sent to Adams. Michael Niles, a semi-retired retirement plan administrator, loaned FCV a total of $250,000, at least some of which came from his retirement account. He eventually converted his loan into an equity share in FCV that turned out to be worthless. Counts 4 and 5 were based on mailings FCV sent to Niles. Linda Elliott invested a total of $125,000 in FCV, money she drew from her retirement account and a home equity line of credit.

According to Jackson, a certified fraud examiner, FCV operated at a loss of roughly $1.3 million in 2012 and $480,000 in 2013 despite the investor funds it raised. Although White, Markowitz, and Itah all provided funding for FCV at startup, each received much more than his principal amount in direct disbursements from FCV's operating account. Together, Markowitz, Itah, Genzone, and Reech received more than $2 million from FCV's account. Beginning in March 2012, White began making withdrawals from FCV's account; within two months, he had paid himself more than his original principal investment of only $20,000. White used funds directly from the FCV account to pay off his

6

personal credit card and car loan debt.  He also generated over $200,000 in checks made out to cash from FCV's bank account, both authorizing the checks and cashing most of them.  All told, White drained from FCV's bank account nearly $840,000 over and above his initial investment.

The model White employed at FCV—inducing people to invest in a company that sells a good or service by representing falsely that the company was very profitable and that investment funds would go towards sales, marketing, and working capital, rather than directly to him and his business partners—was one he had participated in before.  White met Reech, Markowitz, and Itah at a fraudulent venture called Cinergy Health a few years before founding FCV.  Cinergy, run by a man named Daniel Touzier, sold low-cost health insurance plans administered by other insurers but marketed as Cinergy products.  Touzier was described as a serial fraudster who started fraudulent ventures "one after the other."  Doc. 143 at 64. Like FCV, Cinergy solicited investors, mainly retirees, and induced them to buy convertible notes in the company by representing that their money would be used for sales, marketing, and working capital when in fact it was being used to pay interest payments to other investors, as well as exorbitant management salaries and commissions beyond the amounts represented to investors.  White served as "operations manager" of Cinergy's call center, selling health insurance policies for the company.  Doc. 143 at 61.  Reech was a fronter, just as he later was for FCV,

7

and Touzier closed the deals.  While working for Cinergy, White admitted to Reech that Touzier's "businesses were put up to get investor[s'] money in a fraudulent manner."  *Id.* at 65.

White also met Goldstein through Touzier and unsuccessfully attempted to recruit him to work at FCV.  White contacted Goldstein again in 2017 about a new company, MD Call Connect, that White set up after FCV's demise.  At that point, unbeknownst to White, Goldstein had become an informant for the FBI.  Goldstein secretly recorded several conversations he and White had while White attempted to recruit Goldstein to work for MD Call Connect.

The government sought to introduce the recordings and their transcripts at trial.  White objected, arguing that the recordings and transcripts (the "Goldstein recordings") were unrelated to the charged offenses and too remote in time.  The district court overruled White's objection, finding the evidence to be both inextricably intertwined with the charged offenses and admissible as extrinsic evidence under Federal Rule of Evidence 404(b).  The court also gave the jury a limiting instruction, admonishing that the jury "must not consider this evidence to decide if [White] engaged in the activity alleged in the indictment" and could only consider it "to decide whether [White] had the state of mind or intent necessary to commit the crime charged in the indictment."  Doc. 153 at 23.

8

In the recordings, White explained to Goldstein that he intended to run MD Call Connect the same way he had run FCV, which was modeled after Cinergy: by setting up a business to sell customers a good or service—which White and his cohorts referred to as a "widget"—and backing the business with aggressive pitches to investors, pitches that promised quick and massive returns on investment. White himself directly tied his Cinergy experience to his decision to start FCV, explaining that he did "the whole damn thing" at Cinergy when Touzier was unavailable and got "acclimated with it and the ball of [wax]" before realizing that he could simply do it himself by starting "another business." Doc. 174-22 at 89.

White told Goldstein that for MD Call Connect, just like he had at FCV, he planned to talk up the value of the investments his potential investors would be making. White planned to target the same investors repeatedly, saying that if he "g[o]t somebody in" he could "always load them," meaning he could "go back at them" for more money. Doc. 174-22 at 73. White also explained to Goldstein that he used general statements about the use of investor money as "a way to hide commissions or any expenses or money taken by the company." Doc. 139 at 104 (trial testimony of Goldstein); *see* Doc. 174-22 at 76 (explaining that materials given to investors were "very general" so that investors couldn't "come back" and challenge the use of the money). In one specific example, White told Goldstein

9

that some investors asked "to see an operating agreement," and he responded he would "send it," but the "operating agreement [listed] a far less commission" than he promised to pay Goldstein. Doc. 174-22 at 79. White told Goldstein that he could not tell investors he would be paying huge commissions, so he simply listed a lower commission amount in the document he showed investors. He assured Goldstein that he would "pay [him] the agreed amount" out of funds "for advertising" or marketing, or even "[o]ffice space." *Id.* at 79–80.[3]

White presented a case in his defense. Two former FCV employees testified on White's behalf: former sales manager and security guard Mark Goodman and

---

[3] Besides his objection to admission of the Goldstein recordings, White raised several other objections to trial testimony: First, he objected to Reech's testimony that FCV was never profitable and used investor money to pay salaries, arguing that Reech lacked personal knowledge about these subjects and therefore the testimony was inadmissible under Federal Rule of Evidence 602. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."). Second, White objected to Reech's testimony that, after Reech left FCV, an FCV employee told him that the company was receiving customer complaints about unprofessional movers. He argued that the testimony was impermissible hearsay. Third, White objected to Jackson's testimony, based on FCV's bank records, that the business suffered losses in 2012–2013, arguing that it was impermissible expert testimony. Fourth, White challenged Jackson's testimony on the additional ground that the district court erred when it denied his request for re-cross on whether Jackson was familiar with particular transactions. Fifth, White objected during the government's rebuttal closing argument to the replaying of a clip from one of the Goldstein recordings in which Goldstein told White, "It's cheaper than the bank because you never have to pay it [back]," and White did not respond to Goldstein. Doc. 153 at 117. White argued that the government insinuated it was White, not Goldstein, who made that statement. The district court rejected each of these objections, and we discern no error in the court's rulings on them.

On appeal White argues that these errors cumulatively require reversal; however, "[w]here there is no error in any of the trial court's rulings, the argument that cumulative error requires that this Court reverse the defendant's convictions is without merit." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012).

information technology specialist Ivan Gastaldo.  FCV's outside tax preparer, Robert Manela, also testified.  Goodman and Gastaldo testified that they had met White at Cinergy and later worked for him at FCV.  Goodman believed FCV was "a real company doing real sales to consumers."  Doc. 138 at 37–38.  Gastaldo described legitimate business activities he observed at FCV:  the use of moving-industry software, shift work at the sales call center, and the departmentalizing of staff.  Manela, who prepared FCV's tax returns in 2012 and 2013, testified that FCV generated eight million dollars in sales during that period.  He acknowledged that FCV had more than $1.7 million in losses during that period; White and his partners took out millions of dollars from FCV's account for personal use, including to gamble; and given FCV's losses, the company was forced to borrow money or seek new investors to pay interest due to current investors.

White testified in his own defense.  He testified that FCV was a legitimate business, which fell apart unexpectedly because of negative publicity the company received due to a segment aired on The Today Show; investors knew the risks when they got involved; and written statements about the use of investor proceeds were not misleading.  He testified that he did not intend to harm any investor; rather, he hoped their investments would prove profitable.

The jury returned a guilty verdict on all five counts of the indictment.

## B. Motion for Judgment of Acquittal

11

At the close of the government's case (with a standing objection for after the close of all the evidence) and again after the jury returned a guilty verdict, White moved for a judgment of acquittal, arguing that the June 21, 2018 indictment should be dismissed because the counts in it were barred by the five-year statute of limitations in 18 U.S.C. § 3282.[4]  He also argued that the government offered insufficient evidence to prove he intended to harm his alleged victims, citing *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016).  The district court denied the motions.  In its post-trial written order, the district court rejected White's statute of limitations argument because Counts 2 through 5, relating to representations or offers White made to Treat, Adams, and Niles, all occurred within five years of the June 21, 2018 indictment date.  And although Count 1 charged a conspiracy that began "in or around December 2011," outside the five-year mark, it alleged that the conspiracy ended "in or around November 2014," well within five years, and trial "[e]vidence established that the fraudulent misrepresentations and use of the proceeds continued through November 2014." Doc. 196 at 3.

---

[4] "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."  18 U.S.C. § 3282.

As to White's no-intent-to-harm argument, the district court distinguished *Takhalov*, where the Court found that customers of a bar may have "received exactly what they paid for"—a visit to a nightclub—even though the club had failed to disclose a financial relationship between itself and women paid to pose as tourists, locate visiting businessmen, and lure them into the club. *See id.* at 3–5. By contrast, here, the district court said, "victims sustained losses based on [White's] misrepresentations as to how their money would be invested. . . . [White], through his statements and actions, intended to defraud, and not merely to deceive without intending harm, and he obtained the victims' money by using those false pretenses, misrepresentations, or promises." *Id.* at 5. The government's evidence included the victims' testimony that White "made misrepresentations about their investment and the specific use of their money." *Id.*

## C. Sentencing

In anticipation of sentencing, a probation officer prepared a presentence investigation report ("PSR"). The PSR applied a base offense level of seven under U.S.S.G. § 2B1.1(a)(1). The probation officer added a number of enhancements, including: a 16-level enhancement under § 2B1.1(b)(1)(I) because the loss exceeded $1.5 million but was less than $3.5 million, a 4-level enhancement under § 2B1.1(b)(2)(B) because the loss resulted in substantial financial hardship to 5 or more victims, a 2-level enhancement under § 3A1.1(b)(1) because White knew or

13

should have known he targeted a vulnerable victim, a 4-level leadership role enhancement under § 3B1.1(a); and a 2-level enhancement under § 3C1.1 for willfully obstructing or impeding justice. The PSR therefore calculated a total offense level of 35. With a criminal history category of I, this offense level yielded an advisory guidelines range of 168 to 210 months' imprisonment.

White objected to all five of the above-listed enhancements. Applying the 2018 Sentencing Guidelines Manual,[5] the district court overruled White's objections and adopted the facts in the PSR and the probation officer's calculation of the guidelines range. The court sentenced White to 168 months' imprisonment followed by three years' supervised release. The court also ordered White to pay $1,936,400 in restitution.

This is White's appeal.

---

[5] White also objected to the probation office's use of the 2018 Guidelines Manual, in effect at the time of sentencing, over the 2014 Guidelines Manual, arguing that doing so violated the Ex Post Facto Clause of the United States Constitution. The 2014 Manual, which was in effect when the crimes were completed, did not include a 4-level enhancement for substantial harm to five or more individuals.

The district court overruled his objection, explaining that White's total offense level would be 35 under either manual. Although the 2014 Manual did not include the enhancement White had identified, it included a 2-level enhancement for 10 or more victims and a 2-level enhancement for a "large number" of "vulnerable victims," both of which the government established White had. U.S.S.G. §§ 2B1.1(b)(2)(A)(i), 3A1.1(b)(1)–(2) (2014).

Without any specific argument as to how the district court erred, White makes passing references to the district court's application of the 2018 Guidelines Manual over the 2014 Guidelines Manual and argues summarily that the court imposed a substantively unreasonable sentence. Because he did not "plainly and prominently" assert these challenges, we deem them abandoned. *United States v. Jernigan*, 341 F.3d 1273, 1284 n.8 (11th Cir. 2003).

14

## II.    STANDARDS OF REVIEW

We review evidentiary rulings for an abuse of discretion. *United States v. Muscatell*, 42 F.3d 627, 630 (11th Cir. 1995). We review the denial of a motion to dismiss an indictment based on a statute of limitations bar, too, for an abuse of discretion. *United States v. Torres*, 318 F.3d 1058, 1061 n.6 (11th Cir. 2003). Questions of law as to the statute of limitations are reviewed *de novo*. *Id.*

We review the denial of a motion for judgment of acquittal based on insufficiency of the evidence *de novo*. *United States v. Hansen*, 262 F.3d 1217, 1236 (11th Cir. 2001). "To uphold the denial of a motion for judgment of acquittal, we need only determine that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted). When considering the sufficiency of the evidence, we must "view the facts and draw all reasonable inferences therefrom in the light most favorable to the government." *United States v. Slocum*, 708 F.2d 587, 594 (11th Cir. 1983).

With respect to Sentencing Guidelines issues, we review a district court's legal determinations *de novo* and its application of the guidelines to the facts for clear error. *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1136–37 (11th Cir. 2004). For a factual finding to be clearly erroneous, we "must be left with a definite and firm conviction that a mistake has been committed." *Id.* at 1137

(internal quotation marks omitted).  A factual finding cannot be clearly erroneous when the factfinder has chosen between two permissible views of the evidence. *United States v. Saingerard*, 621 F.3d 1341, 1343 (11th Cir. 2010).

## III.  DISCUSSION

On appeal, White advances several challenges to his convictions and sentence.  We address the challenges pertaining to White's convictions first; second, we examine the challenges relating to his sentence.

### A. White's Convictions

White argues that each of his convictions should be overturned.  He contends that the district court abused its discretion in admitting the Goldstein recordings and erred in denying his motions for judgment of acquittal on statute of limitations and sufficiency grounds.  For the reasons set forth below, we disagree.

### 1.  The Goldstein Recordings

White argues that the district court abused its discretion in admitting the Goldstein recordings over his objection.  He contends that the recordings contained evidence neither admissible as intrinsic evidence nor as extrinsic evidence under Federal Rule of Evidence 404(b).  We discern no abuse of discretion.

Uncharged crimes, wrongs, or acts may be admissible either as intrinsic or extrinsic evidence, provided evidence of the conduct meets certain criteria.

Intrinsic evidence may be admitted as follows:

16

> Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.

*United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998) (internal quotation marks omitted); *see United States v. Baker*, 432 F.3d 1189, 1205 n.9 (11th Cir. 2005) ("[I]n this Circuit 'evidence of other crimes, wrongs, or acts' falls outside the scope of Rule 404(b) when it is: '(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense.'" (quoting *United States v. Veltmann*, 6 F.3d 1483, 1498 (11th Cir. 1993))), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 821 (2006).

If the evidence does not qualify as intrinsic, it may nevertheless be admissible as extrinsic evidence: "Evidence of any other crime, wrong, or act . . . may be admissible" for purposes other than as character evidence, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). We undertake a three-part inquiry to determine whether evidence of other crimes, wrongs, or acts is admissible under Rule 404(b): "(1) the evidence must be relevant to an issue other than the defendant's character; (2) the probative value must not be substantially

17

outweighed by its undue prejudice; [and] (3) the government must offer sufficient proof so that the jury could find that the defendant committed the act." *United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005) (internal quotation marks omitted). "The list provided by the rule is not exhaustive and the range of relevancy outside the ban is almost infinite." *United States v. Stephens*, 365 F.3d 967, 975 (11th Cir. 2004) (internal quotation marks omitted). The rule favors inclusion unless the evidence "tends to prove only criminal propensity." *Id.*

Regardless of whether evidence is characterized as intrinsic or extrinsic 404(b) evidence, it must not run afoul of Federal Rule of Evidence 403, which provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

We conclude that the Goldstein recordings contained both intrinsic evidence and extrinsic Rule 404(b) evidence; all of the recordings' contents were admissible.

Evidence in the recordings about FCV, such as why White started FCV and how he operated it, was inextricably intertwined with the charged acts in this case because it "form[ed] an integral and natural part of an account of the crime[s]" for which White stood trial. *McLean*, 138 F.3d at 1403. White, citing our decision in

18

*United States v. Cancelliere*, protests that the evidence is inadmissible because it neither "concerns the context, motive, and set-up of the crime" nor "is linked in time and circumstances with the charged crime." 69 F.3d 1116, 1124 (11th Cir. 1995) (internal quotation marks omitted). Our caselaw, however, makes clear that intrinsic evidence is admissible under broader circumstances than the two White isolates. *See id.* at 1124–25 (permitting admission of evidence that is "necessary to complete the story" of the crime); *McLean*, 138 F.3d at 1403–04 (permitting admission of evidence that "forms an integral and natural part of an account of the crime" or that is necessary to complete the story of the crime). We therefore reject his narrow reading of our intrinsic-evidence precedent and conclude that this evidence was necessary to complete the story of the crime.

We also conclude that the district court was within its discretion not to exclude under Rule 403 intrinsic evidence about FCV's operation. The probative value of White's candid discussions about FCV's operations was not outweighed by any of the reasons for exclusion in that rule. The evidence was not cumulative, misleading, or confusing, nor were the conversations about FCV so prejudicial as to require exclusion. *See United States v. Cross*, 928 F.2d 1030, 1048 (11th Cir. 1991) ("Rule 403 is an extraordinary remedy which should be used sparingly, and the trial court's discretion to exclude evidence as unduly prejudicial is narrowly circumscribed." (internal quotation marks omitted)). Importantly, the district court

19

gave the jury a limiting instruction, which we presume it followed. *See*

*Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("[J]uries are presumed to follow

their instructions . . . .").

Evidence of the other ventures in which White was involved—Cinergy and

MD Call Connect—was properly admitted as extrinsic Rule 404(b) evidence.

Rather than proving "only criminal propensity," *Stephens*, 365 F.3d at 975, this

evidence showed how White gained knowledge of the type of fraudulent business

model he used at FCV, created a plan to start FCV, and seized an opportunity to

put his plan into action, *see* Fed. R. Evid. 404(b). Citing a former Fifth Circuit

decision, *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc),[6] White

argues that the recordings were too remote in time and unrelated to his case and

therefore were unduly prejudicial. That is, he challenges only the second part of

our three-part Rule 404(b) test—whether the probative value of the evidence is

substantially outweighed by undue prejudice. *See Ramirez*, 426 F.3d at 1354. "In

measuring the probative value of the evidence, the judge should consider the

overall similarity of the extrinsic and charged offenses." *Beechum*, 582 F.2d at

915. If the offenses "are dissimilar except for the common element of intent, the

extrinsic [evidence] may have little probative value to counterbalance the inherent

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

prejudice of this type of evidence." *Id.* "The judge should also consider how much time separates the extrinsic and charged offenses: temporal remoteness depreciates the probity of the extrinsic offense." *Id.*

White argues that the evidence in the Goldstein recordings is insufficiently probative to outweigh the undue prejudice that arose from its admission into evidence. As to the probative value, White contends that the time lag between the alleged fraud and conspiracy involving FCV and the MD Call Connect-related Goldstein recordings—nearly four years—severely depreciates the probity of the evidence. He further contends that the evidence from the recordings relating to Cinergy and MD Call Connect was "unrelated to FCV." Appellant's Br. at 28. On the prejudice side of the ledger, White argues that the recordings painted him as a serial fraudster despite the fact that he was never charged for any conduct relating to MD Call Connect.

Although a lag of nearly four years is significant, the evidence in the recordings demonstrated that FCV, Cinergy, and MD Call Connect were closely related. The recordings showed that MD Call Connect was just another venture run in a similar manner as FCV and Cinergy, with White and others he recruited seeking investors by overstating the profitability of the businesses. There was also overlap in the players: Reech in Cinergy and FCV; Goldstein, whom White had met while working at Cinergy, in MD Call Connect; and White in all three

21

businesses. And White sought to entice Goldstein into working for him at MD Call Connect by touting the experience he had gotten at Cinergy and FCV. In one recorded conversation White told Goldstein that he did "the whole damn thing" at Cinergy and got "acclimated with it and the ball of [wax]" before realizing he could do it himself and starting "another business"—FCV. Doc. 174-22 at 89. Thus, the probative value of this evidence was high despite the temporal gap between the charged conduct and the recordings.

The danger of unfair prejudice, conversely, was low. The jury knew about Cinergy from other testimony. The jury knew White had learned the investor-seeking process at Cinergy and had recruited Cinergy employees to work for him. Goldstein also testified. The recordings contained discussions about how White set up his businesses, but they contained nothing flagrantly prejudicial. And, as we have mentioned, the district court gave the jury an instruction addressing the limits on the jury's use of this evidence. *See Richardson*, 481 U.S. at 211. For these reasons, the district court was within its discretion to admit the Goldstein recordings as Rule 404(b) evidence.

### 2. Statute of Limitations

White next argues that the district court should have granted him a judgment of acquittal on all counts because the charges in the indictment were beyond the five-year statute of limitations. In addition to the conspiracy, which the indictment

22

stated ran from about December 2011 to November 2014, the substantive counts stemmed from mailings White sent to victims in 2013 and 2014:

- Count 2:  June 25, 2013 – FCV "Confidential Equity Offer" sent to Treat via the United States Postal Service ("USPS"),
- Count 3:  June 25, 2013 – FCV "Investor Report" sent to Adams via USPS,
- Count 4:  August 1, 2013 – FCV "Letter regarding First Call Notes" sent to Niles via USPS
- Count 5:  October 6, 2014 – FCV "Uncollectible Unsecured Note Form for Self-Directed Accounts" sent to Niles via USPS.

White does not dispute that the government proved these mailings, but he submits that that government "produced no evidence that, after January 2013, there was a purchase of any investment," so "there could be no misrepresentations or omissions to support fraudulent conduct" after that date.  Appellant's Br. at 37. We disagree.

"The elements of mail and wire fraud are:  (1) intentional participation in a scheme to defraud, and, (2) the use of the interstate mails or wires in furtherance of that scheme."  *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). The elements of conspiracy to commit mail and wire fraud are (1) the existence of an agreement to execute a scheme to defraud and (2) use of the mail or wire systems to further the scheme.  *United States v. Smith*, 934 F.2d 270, 274 (11th Cir. 1991).

White has failed to explain how the mailings identified in the substantive counts were not made "in furtherance of" the fraud.  *Maxwell*, 579 F.3d at 1299.

23

He focuses instead on the fact that the use of the mail was not for a specific financial transaction. White has provided no support for such a narrow reading of the mail fraud statute, however, and we see none. Indeed, the Supreme Court has defined the offense broadly:

> Mail fraud . . . occurs whenever a person, having devised or intending to devise any scheme or artifice to defraud, uses the mail for the purpose of executing such scheme or artifice or attempting so to do. The gravamen of the offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contains no false information.

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (citations omitted) (internal quotation marks omitted). We are convinced that the mailings that form the basis of Counts 2 through 5 were at least incident to an essential part of White's scheme to defraud because they advanced the objective of the conspiracy: to defraud investors out of money by misrepresenting FCV's profitability.

White's argument about the Count 1 conspiracy fails for much the same reason. As the facts underlying the substantive counts show, White used the mailings in furtherance of his fraud well into 2013. And nothing supports White's suggestion that the entirety of a conspiracy must be committed within the five-year limitations period; rather, the plain language of the statute indicates that it is the completion date that matters. *See* 18 U.S.C. § 3282 (requiring prosecution to

24

commence "within five years next *after* such offense shall *have been committed*" (emphasis added)).

We therefore agree with the district court that the crimes charged in the indictment fell within the statute of limitations and should not have been dismissed on that ground.

### 3. Sufficiency of the Evidence

White renews here his other argument in favor of a judgment of acquittal: that the government failed to prove the element of intent to defraud. *See Takhalov*, 827 F.3d at 1312 ("[T]o *defraud*, one must intend to use deception to cause some injury."). We reject White's argument.

Perhaps most fundamentally, White testified at trial that he did not intend to harm his investors. When a defendant testifies in his defense after the government has presented "some corroborative evidence of guilt," his testimony, "if disbelieved by the jury, may be considered as *substantive evidence* of the defendant's guilt." *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995); *see id.* (explaining that a jury can "conclude the opposite of [the defendant's] testimony is true"). White argues that although the government may have presented evidence that he intended to *deceive* his investors, it failed to present any corroborative evidence that he intended to harm—that is, *defraud*—them. He bases his argument on our decision in *Takhalov*, in which we explained: "That a

25

defendant merely induced the victim to enter into a transaction that he otherwise would have avoided is . . . insufficient" to prove fraud because "deceiving does not always involve harming another person; defrauding does." 827 F.3d at 1310 (alterations adopted) (internal quotation marks omitted). We remain unconvinced.

In *Takhalov*, "the defendants . . . tricked men to come into the defendants' clubs" by hiring "Bar Girls," or "B-girls," to "pose as tourists, locate visiting businessmen, and lure them into the defendants' bars and nightclubs." *Id.* The defendants admitted this, "believ[ing] this scheme was a perfectly legitimate business model." *Id.* But that is all they admitted. The government's theory was that "[o]nce inside the clubs, employees would pour vodka in the men's beer to get them drunker, misrepresent the prices of drinks, hide menus, cover up prices, and even forge the men's signatures on credit-card receipts." *Id.* The defendants said they had no knowledge of such practices. *Id.* The defendants asked for and were denied a jury instruction that the jury must acquit if it found "that the defendants had tricked the victims into entering a transaction but nevertheless gave the victims exactly what they asked for and charged them exactly what they agreed to pay." *Id.* Based on the court's refusal to give the requested instruction, even if the jury believed the defendants' argument that they knew nothing about the swindling that went on *inside* the club, it could have convicted based on the Bar Girls' misrepresentations alone.

26

We held that the district court abused its discretion in denying the defendants' requested jury instruction. That is because "deceiving is a necessary condition of defrauding but not a sufficient one." *Id.* at 1312. "[I]f a defendant does not intend to harm the victim—to obtain, by deceptive means, something to which the defendant is not entitled—then he has not intended to defraud the victim." *Id.* at 1313 (alteration adopted) (internal quotation marks omitted). "[A] schemer who tricks someone to enter a transaction has not schemed to defraud so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick." *Id.* (internal quotation marks omitted). When the "misrepresentation goes to the value of the bargain," or "the nature of the bargain itself," there is "a scheme to defraud." *Id.* "That lie can take two primary forms: the defendant might lie about the price (*e.g.*, if he promises that a good costs $10 when in fact it costs $20) or he might lie about the characteristics of the good (*e.g.*, if he promises that a gemstone is a diamond when it is in fact a cubic zirconium.)." *Id.* at 1313–14. If, conversely, the alleged victims "received exactly what they paid for," then there is no fraud. *Id.* at 1314 (internal quotation marks omitted). In *Takhalov*, because the jury could have concluded that the defendants were unaware of what went on once the victims were inside the club and were only responsible for the Bar-Girl deception, and the jury could have believed that this was mere deception, not fraud, we reversed.

27

Here, by contrast, the government offered evidence that White presented exactly the kind of lie that *Takhalov* made clear is fraud:  he lied "about the characteristics" of the investments.  *Id.*  He said that the investments were safe, but they were not.  He said the investments were valuable because the business was profitable, but it was not.  The government showed that although White's investors thought they were investing in a diamond, in fact they were investing in a cubic zirconium.  And, as we discussed above, the jury was entitled to disbelieve White's testimony.  We affirm the district court's denial of the motions for judgment of acquittal on sufficiency-of-evidence grounds.

## B. White's Sentence

White also challenges the 168-month sentence the district court imposed, arguing specifically that the court should not have applied five enhancements under the Sentencing Guidelines:  a 16-level enhancement for total loss amount under U.S.S.G. § 2B1.1(b)(1)(I), a 2-level enhancement for having vulnerable victims under U.S.S.G. § 3A1.1(b)(1), a 4-level enhancement for the substantial financial hardship to five or more victims under U.S.S.G. § 2B1.1(b)(2)(B), a 4-level enhancement for White's role as leader or organizer of the scheme under U.S.S.G. § 3B1.1(a), and a 2-level enhancement for White's obstruction of justice under U.S.S.G. § 3C1.1.  As we explain below, we find no error.

### 1. Loss Amount

28

The district court did not clearly err in determining the loss amount of $1,936,400. *See United States v. Cavallo*, 790 F.3d 1202, 1232 (11th Cir. 2015) (explaining that a loss calculation is reviewed for clear error). "'Actual loss' is the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* (citing U.S.S.G. § 2B1.1 cmt. n.3(A)(i)). The Guidelines do not require that a sentencing court make a precise determination of loss; rather, "a sentencing court need only make a reasonable estimate of the loss, given the available information." *Id.* (alteration adopted) (internal quotation marks omitted).

White argues that the loss calculation should have been limited to losses sustained by Adams, Niles, Elliot, and Treat, the testifying victims, and not include all 15 victims about which the government presented evidence at trial. And, he argues, the loss was not foreseeable to White, who was running a booming business until the negative segment ran on The Today Show.[7] We disagree. In arriving at the loss amount, the district court relied on multiple sources of evidence the government supplied, including victim testimony, bank records, and fraud examiner Jackson's testimony and summary exhibits. Specifically, Jackson testified, based upon a review of FCV's bank records, that 15 investors paid a total

---

[7] White further argues that the evidence upon which the district court relied "proved nothing more than investors lost their principal amount not that they had been defrauded." Appellant's Br. at 51. This argument is simply a repackaging of the sufficiency argument he raised in his motions for judgment of acquittal, an argument we have rejected.

29

of $1,936,400 to FCV. The government admitted into evidence an exhibit showing the amount of each investor's payments. There is no support for White's proposition that the court's calculation should have been confined to the losses of the four victims who testified at trial.

The district court also expressly found that the victims' losses were foreseeable to White because he "was the CEO and the owner of" FCV. Doc. 206 at 50. According to the district court: "He designed the company, he executed the scheme, and he actively recruited the investors and was the highest-level operative in this scheme. He knew and was aware of each of the fronters' activities. He provided the scripts. He shared information about potential victims and he was the closer." *Id.* In arguing that the losses were a sudden result of unforeseen bad publicity, White asks us to reverse the district court because there was another plausible explanation. That we cannot do. *See Saingerard*, 621 F.3d at 1343. Based on the evidence admitted at trial and sentencing, we discern no clear error in the district court's loss determination.

## 2. Vulnerable Victim

White challenges the district court's imposition of the vulnerable victim enhancement, arguing that the court applied the enhancement based solely on the age of his victims.  The record, however, demonstrates otherwise.[8]

The Guidelines provide for a two-level enhancement if the defendant knew or should have known that a victim of the offense was a vulnerable victim. U.S.S.G. § 3A1.1(b)(1).  A "vulnerable victim" is a person "who is a victim of the offense of conviction and any relevant conduct for which the defendant is accountable" and "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.* cmt. n.2.  "The increase applies when a defendant selected his victim to take advantage of that victim's perceived susceptibility to the offense."  *United States v. Moran*, 778 F.3d 942, 978 (11th Cir. 2005); *see United States v. Bradley*, 644 F.3d 1213, 1288 (11th Cir. 2011) (applying the enhancement when the victims' vulnerability was "essential to the defendant's choice to victimize them").

Regardless of whether age alone can justify application of the vulnerable-victims enhancement, *see United States v. Lewis*, 842 F.3d 467, 476–77 (7th Cir. 2016) (agreeing that "age alone can be insufficient to justify" the enhancement), we have held that age, in combination with the repeated targeting of victims, "a

---

[8] "[A] district court's factual finding that the victim is vulnerable may be reversed only if it is clearly erroneous."  *United States v. Mathews*, 874 F.3d 698, 706 n.4 (11th Cir. 2017).

31

practice called 'reloading,' constitutes evidence that the defendant knew the victim was particularly vulnerable to the fraud scheme," *United States v. Day*, 405 F.3d 1293, 1296 (11th Cir. 2005).  Here, the government presented evidence that White knew he was targeting retired victims, as well as evidence that White intended to and did target his victims repeatedly.  White explained to Goldstein that if he "g[o]t somebody in" to invest, he could "always load them," or "go back at them." Doc. 174-22 at 73.  In combination, this was ample evidence from which the district court could conclude that White's victims were vulnerable.[9]

### 3. Substantial Financial Hardship to Five or More Victims

White next argues that application of the substantial hardship enhancement was clearly erroneous because the government failed to "present any evidence regarding the percentage of any retirement funds an investor lost or how it impacted their retirement security in any substantial way."  Appellant's Br. at 52–53.  Again, we disagree.

The Guidelines provide for a four-level enhancement if an offense results "in substantial financial hardship to five or more victims."  U.S.S.G. § 2B1.1(b)(2).  A

---

[9] White suggests that the government was tasked with proving that 10 or more victims were vulnerable.  Not so:  both the 2014 and 2018 Guidelines Manuals permit a two-level increase if any victim is vulnerable.  The 2014 Guidelines Manual permits a four-level increase if a "large number" of the defendant's victims were vulnerable.  The PSR noted that "numerous victims" in the scheme were vulnerable.  PSR ¶ 12.  Thus, even if the district court should have applied the 2014 Guidelines Manual, a four-level enhancement would have been warranted.  *See supra* note 5.

victim is defined as "any person who sustained any part of the actual loss determined." *Id.* cmt. n.1. In determining whether this enhancement applies, the district court should consider, among other factors, whether the offense resulted in the victim's: becoming insolvent; filing for bankruptcy; suffering substantial loss of a retirement, education, or other savings or investment fund; making substantial changes to his employment, such as postponing his retirement plans; making substantial changes to his living arrangements, such as relocating to a less expensive home; and suffering substantial harm to his ability to obtain credit. *Id.* cmt. n.4(F).

The district court did not clearly err by finding that White had five or more victims who suffered substantial financial hardship. First, White does not challenge the facts set forth in the PSR that all the victims, except for two (including Niles), suffered a substantial financial hardship. These victims included (1) Adams, who lost money from her individual retirement account ("IRA"), was in the process of losing her house, and was on government assistance to make ends meet; (2) Elliott, who lost money from her IRA, had to mortgage her home, and afterward had to work two jobs to get by; (3) G.E., who lost money from his IRA and had to mortgage his home; (4) Treat, who lost money from his IRA and cannot retire as planned; and (5 and 6) R.W. and D.W., who were unable to pay off their

33

ranch, were forced to drive a high-mileage, dated car, and had little to spend on clothing.

White attempts to undercut the substantial losses of Treat and Adams. He admits that Treat "might have to wait a little bit longer to retire" but emphasizes that Treat "owned a well-established retail clothing store." Appellant's Br. at 53. White argues that Adams has managed to stay in her home and continued investing with Reech until 2017. Even accepting White's assertions, however, these victims' losses were sufficiently substantial to satisfy U.S.S.G. § 2B1.1(b)(2). The district court did not err in applying the enhancement for substantial losses to five or more victims.

### 4. Organizer or Leader

White next challenges the enhancement to his guidelines range for being "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," U.S.S.G. § 3B1.1(a), contending that the government offered no evidence that White led or organized at least five people. White acknowledges that the district court expressly found that Genzone, Reech, Kipness, Markowitz, and Itah were criminal participants; he nonetheless argues that the court did so without reason or evidentiary support. He is mistaken. Reech testified that he, White, and the four other individuals the district court identified were involved in the criminal scheme at FCV. Based on this testimony, the court was

34

entitled to find that White, in his undisputed roles as President and CEO, led or organized the criminal activity charged in this case. *See United States v. Shabazz*, 887 F.3d 1204, 1222 (11th Cir. 2018) (explaining that aggravated-role determinations are factual findings).

### 5. Obstruction of Justice

White's final sentencing challenge is to the enhancement he received for obstructing justice by perjuring himself when he testified at trial that Adams did not request return of her initial investment in FCV and that he paid back to FCV money he withdrew from the company's account and spent at a casino. We conclude, however, that the district court's obstruction findings were not clearly erroneous. *See United States v. Guevara*, 894 F.3d 1301, 1311–12 (11th Cir. 2018) (reviewing a district court's finding that the defendant obstructed justice for clear error).

The Guidelines provide for a two-level enhancement if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing" of his instant offense and "the obstructive conduct related to [his] offense of conviction and any relevant conduct" or "a closely related offense." U.S.S.G. § 3C1.1. A defendant obstructs justice within the meaning of this provision when he commits perjury, defined as "false testimony concerning a

material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Duperval*, 777 F.3d 1324, 1337 (11th Cir. 2015) (internal quotation marks omitted). White argues only that the testimony was not false; he does not challenge the intent or materiality requirements.

The district court first found that White perjured himself when he testified that Adams did not ask for her principal investment back in April 2013, pointing to Adams's contrary trial deposition testimony. White argues that Adams admitted on cross examination that she did not ask for return of her initial investment, but we see no such admission in the record. Rather, Adams testified she told White that she "definitely needed to have the money returned," at which point he offered two percent more in interest if she would keep her principal invested. Doc. 174-24 at 144. "[A]t that point," Adams testified, she still wanted her money back. *Id.* She testified that she "spent quite a bit . . . of money and time . . . trying to recoup the money." *Id.* at 145. Adams also testified that at one point she decided to "hold off for a little bit, see what happens," but she clarified that she always "really wanted to get out of it" and "White knew that. It's just that he said he could not at the time." *Id.* Even if Adams's "hold off" statement, in isolation, supported White's argument, the context of her testimony is wholly consistent with her testimony that she sought return of her principal.

36

Second, the district court found that White perjured himself when he testified that he returned $133,000 of FCV's money that he had taken to gamble at a casino, explaining that FCV bank records contradicted White's assertion and White could offer no evidence to support it. White argues there was no evidence that he lied about reporting use of the company's credit card to his partners or about reconciling what he owed, no evidence that his use of the card created financial difficulty for FCV, and no evidence that he took funds from a specific investor account. Even assuming that White's assertions are correct, these facts would not undercut the lie that the district court relied on to support the enhancement: that White had not paid the funds back to an FCV account. Moreover, even if White could show the district court clearly erred in finding that he failed to return FCV funds he used for personal entertainment, the court's finding that White perjured himself about Adams's request for return of her investment alone would support the obstruction enhancement.

## IV. CONCLUSION

For the foregoing reasons, we affirm White's convictions and sentence.

**AFFIRMED.**